**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| TAMMY LYN HITCHENS, | Civil Action No. 10-571 (SDW) (MCA) |
| Plaintiff, | |
| v. | **OPINION** |
| APTIUM ONCOLOGY, INC., et al., | |
| Defendants. | February 21, 2011 |

**WIGENTON**, District Judge.

Before the Court is a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, filed by defendants Aptium Oncology, Inc., Aptium Oncology Elizabeth, LLC,[1] Trinitas Comprehensive Cancer Center ("Trinitas") and individual defendants Judy Laballarte ("Laballarte"), Ann Marie Rautenstrauch ("Rautenstrauch"), Linda Veldkemp ("Veldkemp")[2] and John Does 1-6 (collectively "Defendants") to dismiss the claims brought by plaintiff Tammy Lyn Hitchens ("Plaintiff") ("Motion for Summary Judgment").

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332. Venue is proper pursuant to 28 U.S.C. § U.S.C. § 1441(a).

This Court, having considered the parties' submissions, decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons discussed below, this Court **GRANTS** Defendants' Motion for Summary Judgment.

---

[1] Collectively, Aptium Oncology, Inc. and Aptium Oncology Elizabeth, LLC., will be referred to as "Aptium."
[2] Collectively, Laballarte, Rautenstrauch, and Veldkemp will be referred as to "Defendant Employees."

1

**FACTUAL AND PROCEDURAL BACKGROUND**

On April 28, 2005, Plaintiff was diagnosed with mild Trimethylaminuria Metabolism ("TMAU") a rare metabolic condition that affects the production of the enzyme Flavin. (Pl.'s Opp'n Br. Ex. J (Dep. Tr. of Tammy Lyn Hitchens, Mar. 14, 2011) 303:21-25; 304:1-20.) As a result of this condition, Plaintiff's body lacks the ability to breakdown trimethylamine in food digestion and "TMAU then builds up and is released in the person's sweat, urine, and breath, giving off a strong fishy odor or strong body odor." (Am. Compl. 2 ¶ 2.) On June 30, 2005, Plaintiff began employment as a radiation therapist with Aptium Oncology, Inc. (Defs.' Mot. Summ. J. ¶ 8.) Plaintiff informed "one or all of the Defendants" of her condition. (Defs.' Br. Ex. A., at 3 ¶ 6.) Plaintiff claims that despite informing Defendants of her condition, she was harassed at work. (*Id*. Ex. A, at 3 ¶ 7.)

In February 2007, Plaintiff made a formal complaint with the Human Resources Department ("HR") regarding comments directed at her from the Defendant Employees that she emitted an odor. (Pl.'s Opp'n Br. Ex. F.) As a result of her complaint, HR performed an investigation and met with Defendant Employees whom denied the allegations. (Pl.'s Opp'n Br. Ex. J 134:13-17; Defs.' Mot. Summ. J. ¶ 16.) On February 14, 2007, Plaintiff, in conjunction with Rautenstrauch from HR, drafted a statement that was presented to Plaintiff's co-workers, which informed them about her TMAU condition. (*Id.* at 17.) On February 23, 2007, Executive Director Richard Emery ("Emery") advised Plaintiff that "her allegations could not be substantiated and that should she encounter any such conduct in the future she should report it immediately." (Defs.' Br. Ex. H; Pl.'s Opp'n Br. Ex. J, at 134:13-24.)

On March 19, 2007, Plaintiff filed another complaint with Rautenstrauch concerning two separate incidents regarding her co-workers saying she "smells like pee." (Defs.' Mot. Summ. J.

2

¶ 20; Pl.'s Opp'n Br. Ex. J, at 155:15-25.)  Plaintiff could not identify who made the statements, because "[she] did not turn around to see who was there." (Defs.' Mot. Summ. J. ¶ 21.)  After an investigation, Rautenstrauch sent correspondence to Plaintiff stating that her claims could not be substantiated.  (*Id*. at ¶ 23; Pl.'s Opp'n Br. Ex. J 134:13-24.)

On April 9, 2007, Plaintiff filed a third compliant to Rautenstrauch alleging that employees were commenting about her "smell."  (Defs.' Mot. Summ. J. ¶ 24.)  Plaintiff further alleged that she was being "followed at lunch by various people including Aptium employees, Trinitas Hospital employees as well as people outside the hospital."  (*Id*. at ¶ 26.)  In November 2007, Plaintiff claims that her co-workers were using the words "pee" and "fish" to refer to her.  (*Id*. at ¶ 25.)  On December 7, 2007, Plaintiff filed her fourth complaint regarding the November 2007 incident.  (*Id*. at ¶ 26.)  The fourth complaint contained general allegations not attributable to any particular co-worker. (*Id*.)  On December 7, 2007, in response to Plaintiff's allegations, Rautenstrach advised Plaintiff that she should call 911 if she is being followed and requested that Plaintiff provide more specifics as to who, when, and what was said concerning the events in November 2007.  (*Id*. at ¶ 27.)  On January 7, 2008, Plaintiff provided an email response to Rautenstrauch's December 7, 2007 letter where she identified "Judy and Linda" and further stated that, "[t]o name names would almost be impossible since the list is too long."  (*Id*. Ex. P.)

On October 16, 2008, Plaintiff claims she overheard Dr. Henson tell a nurse, from approximately ten feet away, that "we wouldn't have to do this if you would get the point and get your fishy 'a' out." (Pl.'s Opp'n Br. Ex. J, at 225:1-228:21, 229:2-4.)  Plaintiff testified that she confronted Dr. Henson, while a patient was still on the table, and asked what she meant by her statement.  (*Id*. Ex. J, at 231:19-233:16.)  Dr. Henson responded that she did not know what Plaintiff was referring to, and denied making the statement. (*Id*.)  Plaintiff also testified that she

tape recorded the conversation with Dr. Henson since "before the patient had come into [sic] the table."[3]  (*Id*. Ex. J, at 234:20-235:20.)

Subsequently, a meeting was held between Dr. Henson, Veldkamp, and Plaintiff in which Dr. Henson denied making the statement.  (Defs.' Mot. Summ. J. ¶ 34.)  During this meeting, Plaintiff alleged that she overheard Dr. Henson make disparaging statements about her.  (Pl.'s Opp'n Br. Ex. J 247:12-21.)  Plaintiff was placed on paid leave of absence on October 17, 2008.  (Defs.' Mot. Summ. J. ¶ 36.)

On October 27, 2008, Rautenstrach informed Plaintiff that she was required to undergo an assessment and evaluation of her fitness for duty.  (Defs.' Br. Ex. R.)  On December 10, 2008, Dr. Badaracco-Apolito, a psychiatrist, concluded that Plaintiff suffers from "Delusional Disorder" (*Id.* Ex. S, at 5.)  Dr. Apolito recommended Plaintiff to be in an "out-patient psychiatric care" with a review in four to six months.  (*Id*. at 5-6.)  Specifically, Dr. Apolito's report states:

> In terms of doing her work itself, there is no indication that Ms. Hitchens is deficient in her work, deflected from her work or uses any impaired judgment in her work, none that could be ascertained or detected in the course of the evaluations.  A full assessment of how she performs at work certainly needs to be made by those supervising her.

(*Id.* Ex. S, at 5.)

Plaintiff claims that Dr. Badaracco-Apolito's concluded that she could perform her work, yet Defendants demanded that she undergo medical treatment and that she apply for leave based upon being disabled due to a mental problem.  (Am. Compl. 4 ¶ 10.)  Plaintiff claims that she was terminated when she refused.  (*Id*.)  On December 19, 2008, Rautenstrauch sent Plaintiff a letter indicating the Aptium was eager for her to return to work "[h]owever, in compliance with

---

[3] The transcript indicates there may have been concern that the recording was a HIPAA violation. (Pl.'s Opp'n Br. Ex. J 236:12-237:18.)

4

Dr. Badaracco-Apolito's recommendation [Plaintiff was] required to submit documentation that [she was] receiving outpatient psychiatric care prior to being returned to duty. (Pl.'s Opp'n Br. Ex. L.)

The December 19, 2008, letter included a memo regarding FMLA. (*Id.* Ex. M.) On December 22, 2008, pursuant to the Family Medical Leave Act ("FMLA"), Plaintiff was placed on leave for twelve weeks. (*Id.*)

On February 21, 2009, a doctor Robert Schnitzlein wrote a letter "To Whom It May Concern" stating that "my opinion is that there is no psychiatric/psychological reason why Tammy Hitchens should not return to work full time and without limitation. The start date could be immediately." (Pl.'s Opp'n Br. Ex. E.)

On April 8, 2009, Trinitas changed Plaintiff's leave status to Extended Medical Leave ("EML") as a reasonable accommodation to her ongoing medical condition. (Defs.' Br. Ex. V.)

On June 12, 2009, Plaintiff sent a "Return to Work" note signed by Dr. Eddie M. Gamao, Plaintiff's general practitioner. (Defs.' Mot. Summ. J. ¶ 43.) Defendant rejected the "Return to Work" form and advised Plaintiff that a more specific and detailed report that addressed Dr. Apolito's concerns would be required. (*Id.*) Plaintiff did not comply with Dr. Apolito's recommendation of outpatient psychiatry along with appropriate medication. (Defs.' Br. Ex. D. 303:8-10.) On September 3, 2009, Rautenstrach sent a final letter to Plaintiff advising her that Defendant's have considered her to have voluntarily resigned. (Pl.'s Br. Ex. O.)

On August 26, 2009, Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging disability discrimination and retaliation against Trinitas. (Pl.'s Opp'n Br. Ex. B.) On December 23, 2009, Plaintiff filed an amended complaint ("Amended Complaint") with the Superior Court of New Jersey Law Division alleging violations of the

5

Americans with Disabilities Act of 1990 (Count I) and the New Jersey Law Against Discrimination ("NJLAD") (Count II), as well as breach of contract (Count III) and breach of the covenant of good faith and fair dealing (Count IV), harassment (Count V), retaliation (Count VI), intentional infliction of emotional distress (Count VII), and reckless infliction of emotional distress (Count VIII) against Defendants. (*See generally* Am. Compl.)  On January 29, 2010, the action was removed to the United States Federal District Court of New Jersey. (Not. of Removal 2-3.)

**LEGAL STANDARD**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A factual dispute is genuine if a reasonable jury could return a verdict for the nonmovant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Once the moving party meets the initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001).  The court may not weigh the evidence and determine the truth of the matter but rather determine whether there is a genuine issue as to a material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249.  In doing so, the court must construe the facts and inferences in a light most favorable to the nonmoving party. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991).

The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobuik v. United States Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005). "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves . . . ." *Celotex Corp. v. Catrett*, 477 U.S. at 324. A motion for summary judgment is meant to go beyond the pleading and therefore "factual specificity is required of a party who opposes such a motion." *Black Car Assistance Corp. v. New Jersey*, 351 F. Supp. 2d 284, 286 (D.N.J. 2004). Further the nonmoving party is required to "point to concrete evidence in the record which supports each essential element of its case." *Id.* If the nonmoving party "fails to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. at 323.

**DISCUSSION**

Plaintiff claims TMAU is a disability within the definition of the Americans with ADA and NJLAD. (Am. Compl. ¶¶ 3-4.) Plaintiff alleges that Defendants discriminated against her based on her condition in violation of the ADA (Count I) and NJLAD (Count II).

Defendants assert that Plaintiff's claims should be dismissed mainly on the following two grounds: 1) Plaintiff failed to exhaust administrative remedies against her "actual employer"; and 2) Plaintiff cannot make out a prima facie case of discrimination regarding her claims against Defendants. (*See* Def.'s Br. 1, 3-4.)

**ADA**

A plaintiff initiating a discrimination claim under the ADA, has the burden of presenting a prima facie case showing that: "(1) he was a qualified individual with a disability or who was

regarded as having a disability; and (2) that he suffered an adverse employment action as a result of his disability or perceived disability." *Bjorklund v. Phila. Hous. Auth.*, 118 Fed. Appx. 624, 625-26 (3d Cir. 2004) (citing *Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 511-12 (3d Cir. 2001)).[4] The ADA was designed to protect not only those who are actually disabled but also persons who are perceived as or "regarded as" disabled. *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 774 (3d Cir. 2004). Thus, an employer who commits a mistake that causes perception of "the employee as disabled within the meaning of the ADA, i.e., a mistake that leads the employer to think that the employee is substantially limited in a major life activity" will be held liable for discrimination under the ADA. *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 192 (3d Cir. 1999).

The Third Circuit has defined "regarded as disabled" under the ADA as referring to someone who:

> (1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by the covered entity as constituting such limitation;
>
> (2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or
>
> (3) Has [no such impairment] but is treated by a covered entity as having a substantially limiting impairment.

*Eshelman v. Agere Sys.*, 554 F.3d 426, 434 (3d Cir. 2009) (quoting *Taylor*, Inc., 177 F.3d at 187); *see also* 29 C.F.R. § 1630.2 (l).

Therefore, a plaintiff is "regarded as" disabled pursuant to the ADA "if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or

---

[4] Stated alternatively, to "establish a prima facie case of discrimination under the ADA, a plaintiff must show '(1) [she] is a disabled person within the meaning of the ADA; (2)[she] is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3)[she] has suffered an otherwise adverse employment decision as a result of discrimination.'" *Fulton v. Johnson & Johnson Pharm. Research and Dev.*, No. 05-819, 2008 WL 544668 *8 (D.N.J. Feb. 26, 2008) (citing *Gaul v. Lucent Technologies*, 134 F.3d 576, 580 (3d Cir.1998)).

8

more major life activities." *Murphy v. UPS*, 527 U.S. 516, 522 (1999). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A); *see also* 29 C.F.R. § 1630.2(i).

Defendants argue that Plaintiff is not disabled within the meaning of the ADA or NJLAD. Defendants refer to Plaintiff's own statements about being able to work, being a good worker, and that individuals with TMAU physically are able to do "anything that any normal person can do." (Defs.' Br. 6; *Id.* Ex. D 59:21-24.) Plaintiff is currently working in radiology and is simultaneously completing two degrees. (Defs.' Br. Ex. D at 303:15-20.) Further, Plaintiff does not specifically contend that she was regarded as having a disability.

Even if Plaintiff was perceived or regarded as disabled, Defendants have provided a nondiscriminatory reason for letting her go. Following the incident on October 16, 2008, Plaintiff was evaluated and diagnosed by Dr. Apolito with a "Delusional Disorder." (*Id.* Ex. S, at 5.) It was suggested that she needed outpatient psychiatric services. (*Id.* at 6.) Defendants note this as the source of concern regarding Plaintiff's fitness for duty and thus for letting her go. (Defs.' Br. 8.) Plaintiff has been unable to refute the findings or the evaluation. Plaintiff did not provide documentation or medical evaluations specifically addressing Dr. Apolito's recommendations, although she did submit letters/notes from physicians. Defendants point out that the letters were not specific to the October 2008 incident or a detailed report disputing Dr. Badaracco-Apolito's assessment which stated that Plaintiff may have had "hallucinations and/or possible illusory phenomena." (Defs.' Br. Ex. S 4; Defs.' Br. 9, 13.) Defendants claim that on August 19, 2009, Rautenstrach advised Plaintiff that if proper return to work documentation was

not received by September 3, 2009 Plaintiff would be considered to have voluntarily resigned. (Defs.' Mot. Summ. J. ¶ 44.) As discussed below, Plaintiff has not shown Defendants' proffered reason to be pretextual.

Additionally, Plaintiff did not exhaust her administrative remedies. Title VII requires that an aggrieved person file a charge within 180 days of the alleged discriminatory action or practice and after receiving a right to sue letter from the EEOC may file an action in court against the named respondent. *See* 42 U.S.C. § 2000e-5. It appears that Plaintiff did not file with the EEOC or New Jersey Division of Civil Rights against Aptium.[5]

**NJLAD**

Pursuant to NJLAD, an employer may not discharge an employee on discriminatory grounds or engage in unlawful employment practices. N.J.S.A. 10:5–12. "To establish a prima facie case for failure to accommodate under the NJLAD, Plaintiff must prove (1) she was handicapped; (2) was qualified to perform the essential functions of the job, with or without accommodation, and (3) suffered an adverse employment action because of the handicap." *Fulton v. Johnson & Johnson Pharm. Research and Dev.*, No. 05-819, 2008 WL 544668 *12 (D.N.J. Feb. 26, 2008) (citing *Bosshard v. Hackensack Univ. Med. Ctr.*, 345 N.J.Super. 78, 91 (App. Div. 2001).)

Assuming Plaintiff could make out a prima facie case for discrimination based on her disability, the "burden would then shift to the defendants to 'demonstrate either the reasonableness of the otherwise-discriminatory act or the presence of a non-discriminatory reason for the employee's treatment.'" *Nieves v. Individualized Shirts*, 961 F. Supp. 782, 796 (D.N.J. 1997) (citing *Maher v. New Jersey Transit R.O.*, 125 N.J. 455, 481 (1991)). Once

---

[5] Even in the Amended Complaint, Plaintiff often refers to Trinitas and Aptium interchangeably as her employer, but was actually employed by Aptium. (*See* Defs.' Statement of Facts ¶¶ 8-9; Am. Compl. 2.)

defendant has provided a legitimate nondiscriminatory reason for firing plaintiff, the burden then shifts to the plaintiff to show that the proffered reason is pretext. *See Nieves*, 961 F. Supp. at 796.

In the instant matter, first Defendants argue that Plaintiff is not disabled within the meaning of NJLAD. (Defs.' Br. 10.); *see* N. J. Stat. Ann. § 10:5-5(q). Defendants subsequently assert that they had a legitimate nondiscriminatory reason for firing Plaintiff, namely not because of Plaintiff having TMAU, but because there was concern regarding her fitness for duty. (Defs.' Br. 12.) Defendants also assert that Plaintiff's responsibilities as a radiation therapist including assisting in delivering high dose radiation to cancer patients. (Defs.' Br. Ex. D. 22-26.) Any mistake or oversight by a radiation therapist could lead to dire consequences. (*Id*.)

Plaintiff alleges that Defendants had a "premeditated plan of placing the Plaintiff on leave pending IME [Independent Medical Examination] to evaluate fitness of duty prior to October 17, 2008." (Pl.'s Opp'n Br. 2.) However, Plaintiff has not provided any specific factual allegations to indicate that Defendant Aptium's reasons were pretextual. Plaintiff refers only to Defendant "subjecting Plaintiff to Mental Evaluations for no legitimate cause by Defendants and then termination not 'voluntary resignation' as stated in Defendants September 3, 2009 letter to Plaintiff." (Pl.'s Opp'n Br. 2.)

Plaintiff sought to refute Dr. Badaracco-Apolito's recommendation and report. (Defs.' Br. Ex. D, at 263-64.) Plaintiff was apparently examined by two different doctors, but neither physician provided a specific report disputing Dr. Badaracco-Apolito's recommendations and assessment regarding diagnosis and the need for outpatient case. (*Id*. at 264.) "Ultimately, APTIUM accepted the plaintiff's resignation based upon the plaintiff's refusal to adhere to the fitness for duty evaluation or to provide a physician's report disputing said fitness for duty

findings." (Def.'s Br. 9.) Thus, Defendants have provided a nondiscriminatory reason for the employment action and Plaintiff does not provide, nor does the record contain, a basis to find the reason provided was pretextual.

**Claims against the Individual Defendants**

Defendants move to dismiss the ADA claim, asserting that employees cannot be held liable under this statute. The statutory definition of the term "employer" under the ADA "means a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person . . . . ." 42 U.S.C. § 12111(5)(A); *see* 42 U.S.C. § 2000e(b). Similarly, under Title VII, "employer" is defined as "a person . . . who has fifteen or more employees . . . and any agent of such person." 42 U.S.C. § 2000e(b). Individual employees cannot be held personally liable as "employers" under Title VII of the Civil Rights Act. *See Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1077 (3d Cir. 1996)("the clear majority of the courts of appeals that have considered this question have held that individual employees cannot be held liable under Title VII."); *see also Tomka v. Sieler Corp.*, 66 F.3d 1313, 1314-17 (2d Cir. 1995).

In *Sheridan v. E.I. DuPont de Nemours & Co.,* plaintiff Sheridan contended that the district court erred in dismissing a defendant on the ground that individual employees may not be held liable under Title VII. 100 F.3d at 1061. Plaintiff Sheridan argued that there was no language in 42 U.S.C. 2000e-2(a) to exclude individuals from liability and looked to the law of agency to support the proposition that agents can be held jointly liable with employers. *Id.* The Third Circuit noted that:

> when Congress amended the statute in 1991 to provide a detailed sliding scale of damages ranging from $50,000 for an employer of more than 14 and fewer than 101 employees, to $30,000 for employers with more than 500 employees, 42

12

> U.S.C. § 1981a(b)(3), it made no reference as to the amount of damages, if any, that would be payable by individuals.

100 F.3d at 1077.  Ultimately, the Third Circuit was "persuaded that Congress did not intend to hold individual employees liable under Title VII." *Id.* at 1078.

In *Tomka v. Seiler Corp.*, the Second Circuit rejected the notion that the phrase "and any such agent" in the definition of employer was intended to impose individual liability upon all agents of employers. 66 F. 3d at 1314-17.  The Second Circuit reasoned that when Congress limited Title VII liability to employers with fifteen or more employees, it intended to shield individuals from liability. *Id.*  Further, when considering individual liability under the ADA the focus is on issues of control and authority. *Coddington v. Adelphi University*, 45 F.Supp.2d 211, 215 (E.D.N.Y. 1999)("Applying the 'control' test, courts have been reluctant to hold individual employees who are not policy makers liable under the ADA."); *see also Gary v. Long*, 59 F.3d 1391, 1399 (D.C. Cir. 1995).

In the instant matter, the individual Defendant Employees before this Court lacked the power to control hospital policy and thus are not subject to individual liability under the ADA.  There is no indication that they were policy makers or had any control over hospital policy.  Thus, Plaintiff cannot maintain an action against them for individual liability.

**Breach of Contract**

Plaintiff alleges breach of contract against the Defendants jointly and severally (Count III).  Plaintiff argues "there was no identified cause for the Defendants to require the Plaintiff to adhere to an IME."  (Pl.'s Opp'n Br. 3.)  However, as discussed below, Plaintiff cannot succeed on a claim for breach of contract.

"An employer may discharge an at-will employee for good cause, for bad cause, or for no cause, unless the termination 'threaten[s] clear mandates of public policy.'" *Smith v. Neyer,*

13

*Tiseo & Hindo, Ltd.*, No. 92–6799, 1993 WL 57653 (E.D. Pa. 1993) (internal citation omitted). In *Witkowski v. Thomas J. Lipton, Inc.,* plaintiff Witkowski was fired by defendant Lipton for theft of a can of oil.  643 A.2d 546, 548 (N.J. Sup. Ct. 1994).  Witkowski denied that he had stolen the oil and asserted that under Lipton's employment manual he could not be fired without cause.  *Id.*  Witkowski argued "that any manual that broadly deals with employee relations will now give rise to an implied contract to discharge only for cause, even if the manual does not promise continued employment and does not contain a comprehensive termination policy."  *Id.* at 552. (internal quotation marks omitted).  The *Witkowski* court also noted that the employee manual in that case contained a purported disclaimer.  *Id.* at 554.  As a result of the disclaimer, the court stated that, "an implied contract based on an employment manual may be negated by the inclusion of a clear and prominent dislcaimer."  *Id.* (citing *Woolley v. Hoffman LaRoche*, 99 N.J. 284, 285 (1985) *modified*, 101 N.J. 10 (1985)).  Further, other courts have noted that the referenced case holdings "did not eliminate the power of an employer to retain the 'absolute power to fire anyone with or without good cause.'"  *Brunner v. Abex Corp.*, 661 F.Supp. 1351, 1355 (D.N.J. 1986)(citing *Woolley*, 99 N.J. at 309).

>In the instant matter, Plaintiff alleges the following:
>
>At all relevant times, Defendants have represented to the Plaintiff, orally and in writing, that her employment relationship with Trinitas would be based on good faith, that employees would be treated fairly and equitably, that employees would receive just compensation for the services rendered.  These provisions and representations formed part of Hitchens' express employment agreement with Trinitas and were specified in the Trinitas Employee Handbook.

 (Am. Compl. p. 8.)

Plaintiff does not provide specific details how an oral contract regarding her employment may have been created.  When Plaintiff began working at Aptium Oncology, Inc., Plaintiff signed a document entitled "Receipt of Employee Handbook," which stated that "employment

14

with the Company is not for a specified term and is at the mutual consent of the employee and the Company.  Accordingly, either the employee or the Company can terminate the employment relationship *at will*, with or without cause, at any time."  (Defs.' Br. Ex. E ¶ 2)(emphasis added).  Plaintiff was an "at will" employee who could be terminated.  (*Id.*; *see also* Defs.' Statement of Facts ¶¶ 8-10.)   Contrary, to Plaintiff's comment that "[l]egally, the Defendants had an obligation to present with concrete cause to the Plaintiff as to the reason for the leave and the required IME," Plaintiff could be terminated "at will" without good cause.  (Pl.'s Opp'n Br. 3.)  At her deposition, Plaintiff testified and acknowledge that she was an at will employee at Aptium Oncology.  (Defs.' Br. Ex. D, 108:3-9.)   Thus, there was no actual or implied contract that would provide that Plaintiff, as an at will employee, could only be let go for cause or based on performance.

**Breach of the Covenant of Good Faith and Fair Dealing**

Plaintiff alleges breach of the covenant of good faith and fair dealing against Defendants (Count IV).  "In the absence of a contract, there is no implied covenant of good faith and fair dealing which might be used as a basis for finding a right to continued employment."  *Barone v. Leukemia Society of America*, 42 F.Supp.2d 452, 457 (D.N.J.1998).  In *Schlichtig v. Iancom Corp.,* plaintiff Schlichtig contended that his termination constituted a breach of the implied duty of good faith and fair dealing arising out of the binding contractual commitments set forth in his employer's policies and procedures manual.  271 F. Supp. 2d 597, 606 (2003) (internal citation omitted).   Schlichtig's employment was covered by a written employment agreement that expressly confirmed the "at-will" nature of his employment.  *Id*. at 607.

The *Schlichtig* court held that, "while some New Jersey courts have suggested that the doctrine of good faith and fair dealing may attach to aspects of the at-will employment

15

relationship . . . . none of th[o]se cases h[e]ld that an employer's obligation to act in good faith imposes on the employer a contractual obligation to provide continued employment or to fire only for good cause." *Id.* (internal quotations and marks omitted); *see also Brunner v. Abex Corp.*, 661 F.Supp. at 1356.

In the instant matter, Plaintiff was an at will employee, and Defendant Aptium could let Plaintiff go at any time for a nondiscriminatory reason. Plaintiff cannot succeed with a claim for breach of the covenant of good faith and fair dealing against Defendants.

**Harassment**

Plaintiff alleges harassment by Trinitas and the individual Defendants, Laballarte, Rautenstrauch, Veldkemp and John Does 1-6 and that it "was malicious, willful, and wanton, and justifies an award of punitive damages" (Count V). (Compl. 13.)

The Third Circuit set forth the standard for a claim for harassment based on disability, like one under Title VII, by requiring the following: (1) plaintiff be a qualified individual with a disability under the ADA; (2) plaintiff was subject to unwelcome harassment; (3) harassment was based on disability or a request for an accommodation; (4) harassment was severe or pervasive so as to alter the conditions of her employment and to create an abusive working environment; and (5) that defendant employer knew or should have known of the harassment and failed to take prompt effective remedial action. *Walton v. Mental Health Assoc. of S. Pa*., 168 F.3d 661, 667 (3d Cir. 1999) (affirming the decision of the district court and finding that plaintiff did not produce sufficient evidence of an objectively hostile environment to make out a prima facie case of harassment). "To prove an 'abusive work environment' under Title VII, the environment must be shown to be objectively hostile or abusive, and the plaintiff must have perceived it as a hostile or abusive environment." *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510

U.S. 17, 22 (1993)); *see also Newman v. GHZ Osteopathic, Inc*., 60 F.3d 153, 158 (3d Cir. 1995)("in pretext cases a plaintiff need prove only that the illicit factor played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process.")(internal citation and quotation marks omitted).

Here, first, even if Plaintiff were to establish a disability under the ADA, Plaintiff's statements and allegations regarding Defendants do not state a case for harassment. Second, Plaintiff has not stated a claim for harassment was based on disability or a request for an accommodation for TMAU, her claimed disability. Third, Plaintiff's allegations are not severe or pervasive enough to give rise to a claim for harassment. Lastly, Plaintiff does acknowledge that her employer investigated her complaints and attempted to address them, although not to her satisfaction. Thus, Plaintiff cannot meet the elements to succeed on a claim for harassment.

**Retaliation**

Plaintiff alleges retaliation by Trinitas, Laballarte, Rautenstrauch, Veldkemp, and John Does 1-6 (Count VI). (Am. Compl. 14.) In order to establish a prima facie case of discriminatory retaliation the plaintiff must show the following: 1) that she engaged in protected activity, 2) that the employer took adverse action against her, and 3) that a causal link existed between the protected activity and the employer's adverse action. *Kachmar v. Sunguard Data Systems, Inc.,* 109 F.3d 173, 177 (3d Cir. 1997) (citations omitted).

Cases in which the required causal link has been at issue have often focused on the temporal proximity between the employee's protected activity and the adverse employment action, however, where there is lack of temporal proximity, circumstantial evidence of a "pattern of antagonism" following the protected conduct can also give rise to the inference. *See generally*

17

*Robinson v. Southern Pa. Transp. Auth*., 982 F.2d 892, 895-96 (3d Cir. 1993); *see also Zanders v. Nat'l R.R. Passenger Corp*., 898 F.2d 1127, 1135 (6th Cir. 1990).

Plaintiff has not indicated such a pattern of antagonism existed after she engaged in protected activity. After entering Plaintiff's complaints, the alleged comments of her coworkers do not relate to her filing a complaint and retaliatory behavior of her employer has not been indicated. Defendants met their burden to show that the adverse employment action or termination resulted from Plaintiff's failure to provide documentation and concern about her fitness for duty. Thus, Plaintiff cannot succeed with this claim for retaliation.

**Intention Infliction of Emotional Distress and Reckless Infliction of Emotional Distress**

Plaintiff also asserts claims of intentional infliction of emotional distress (Count VII) and reckless infliction of emotional distress (Count VIII) against the Defendants. (Am. Compl. 15, 18.) However, as discussed below, Plaintiff has failed to set forth a basis by which she could succeed on claims for intentional or reckless infliction of emotional distress.

New Jersey does recognize the tort of intentional infliction of emotional distress. *Griffen v. Tops Appliance City, Inc.*, 337 N.J. Super. 15, 22 (2001). However, there is an elevated threshold for liability and damages that is only satisfied in extreme cases. *Id.* at 23. The elevated threshold allows courts to provide relief for legitimate claims and eliminate frivolous claims. *Id.* For a plaintiff to prevail on his or her intentional infliction of emotional distress claim, "(1) the conduct must be extreme and outrageous (2) [it] must be intentional or reckless (3) it must cause emotional distress and (4) the distress must be severe." *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1273 (3d Cir. 1979).

For the court to find that a defendant's conduct was extreme or outrageous, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible

bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Buckley v. Trenton Sav. Fund Soc'y*, 111 N.J. 355, 366 (1988)(internal citations omitted). In *Cox v. Keystone Carbon, Co.*, the Third Circuit stated that "it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." 861 F.2d 390, 395 (3d Cir. 1988). Specifically, the loss of employment is a common event and does not provide a basis for recovery for intentional infliction of emotional distress. *Id.* (internal citations omitted).

Additionally, the plaintiff must show that the defendant acted intentionally or recklessly. The defendant will be liable for an intentional act if they "intend[ed] both to do the act and to produce emotional distress." *Griffin v. Tops Appliance City, Inc.*, 337 N.J. Super. 15, 23 (2001). A defendant may also be held liable if the individual "acts recklessly in deliberate disregard of a high degree of probability that emotional distress will follow." *Id.* Further, the defendant's conduct must have been the proximate cause of the plaintiff's emotional distress. *Id.* at 22-23. Finally, the plaintiff's emotional distress must be "so severe that no reasonable man could be expected to endure it." *Buckley*, 111 N.J. at 366. (quoting *Restatement (Second) of Torts* § 46 cmt. j (1965)). Accordingly, the plaintiff must show a "severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." *Taylor v. Metzger*, 152 N.J. 490, 515 (1998).

In the instant matter, Plaintiff claims she "has Established a Prima Facie Case for Intentional or reckless infliction of emotional distress by Defendants and representative counsel by way of release personal information Like Social Security Number." (Pl.'s Opp'n Br. 12.) Plaintiff makes no specific allegations regarding comments or insults made by Defendant

19

Employees.  (*See* Am. Compl.)  Also, the isolated incidents Plaintiff described, do not rise to a level of intentional or reckless infliction of emotional distress as required by law.  Plaintiff has not alleged conduct so outrageous or extreme as to rise to the level of intentional or reckless infliction of emotional distress, nor has she indicated that she suffered severe emotional distress as would be diagnosed or recognized by a health professional.  *See Taylor v. Metzger*, 152 N.J. at 515.

**CONCLUSION**

For the reasons stated above, Defendants' Motion for Summary Judgment is **GRANTED**.

s/Susan D. Wigenton, U.S.D.J.

Orig:   Clerk
Cc:     Madeline Cox Arleo, U.S.M.J.
        Parties